**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patrick Wade Bearup,<br><br>    Petitioner,<br><br>v.<br><br>David Shinn, et al.,[1]<br><br>    Respondents. | No. CV-16-03357-PHX-SPL<br><br>**ORDER**<br><br>DEATH PENALTY CASE |

Pending before the Court is Petitioner Patrick Wade Bearup's Motion to Amend. (Doc. 101.) Bearup, an Arizona death row inmate, seeks to amend three of the claims in his habeas petition and to raise three additional claims. He contends that amendment is appropriate based on evidence discovered after he filed his petition. First, Bearup learned that the Arizona Supreme Court performed its independent review of his death sentence without access to the minute entry and transcript from the sentencing hearing on his kidnapping conviction. (*Id.* at 2–5.) Next, Bearup cites two newly-disclosed letters from the prosecutor in his case to an attorney for co-defendant Sean Gaines. (*Id.* at 5.) Respondents oppose amendment. (Doc. 113.) For the reasons set forth below, amendment is denied.

---

[1] David Shinn, Director of the Arizona Department of Corrections, is substituted for his predecessor pursuant to Fed. R. Civ. P. 25(d)(1).

**BACKGROUND**

In 2007, Bearup was convicted of one count of kidnapping and one count of first-degree murder, for which he was sentenced to death. The following background is taken from the opinion of the Arizona Supreme Court in *State v. Bearup*, 221 Ariz. 163, 166–67, 211 P.3d 684, 687–88 (2009).

In February 2002, Jessica Nelson discovered that money was missing from her room. She suspected that Mark Mathes, another resident of the home, had taken it. Nelson called Sean Gaines and told him of her suspicion. Gaines instructed her to call back when Mark returned home.

Nelson told Bruce and Marie Mathes, the owners of the home, that Gaines, Jeremy Johnson, and Bearup were going to confront Mark about the missing money. Bruce asked Nelson to retrieve a ring he had previously given Mark, his brother, as a present. When Mark returned home that evening, Nelson called Gaines and told him that Mark was back.

Gaines and Johnson armed themselves and left for Nelson's house. On the way, they stopped at a convenience store to meet Bearup.

The three men got out of their vehicles and approached the Mathes home. Gaines carried a loaded shotgun, Johnson had a baseball bat, and Bearup brought a folding knife. Bearup, Johnson, and Gaines surrounded Mark, who was sitting at a table on the rear patio with Nelson. Johnson attacked Mark with the bat, striking him repeatedly in the head and upper torso.

The witnesses disagreed about whether Mark was alive following the beating. Nelson was certain that Mark was killed on the patio; Johnson testified that Mark was still conscious and groaning. After the attack, Johnson and Bearup dragged Mark to one of the cars and stuffed him in the trunk. Bearup kicked Mark's head to make him fit into the trunk. The perpetrators got into two vehicles and drove to an isolated area near Crown King.

When the cars stopped on Crown King Road, Bearup pulled Mark from the trunk. Gaines and Nelson stripped off his clothes to make the body more difficult to identify. As Nelson was struggling to remove Mark's ring, Bearup approached and cut off the finger

with a pair of wire clippers. Mark was then thrown over the guardrail. As he lay in the ravine below, Gaines shot him twice.

The perpetrators then returned to their vehicles and left for Phoenix. Bearup drove Nelson home. She returned the ring to Marie. Bearup told Marie that she did not have to file a missing person's report because Mark would never be found.

Bearup later told his ex-wife that he had gone with friends to beat up a man who had stolen a ring, but the person was killed and he helped dispose of the body. He also told an ex-girlfriend about the killing. She overheard Bearup laughing as he talked about cutting off the victim's finger.

Bearup was indicted on one count of kidnapping and one count of first-degree murder. The State alleged two aggravating factors: a previous conviction for a serious offense, A.R.S. § 13–703(F)(2), and the commission of the offense in an especially heinous, cruel, or depraved manner, (F)(6).

At trial, Bearup presented alibi and mistaken identity defenses. The jury convicted him of kidnapping and first-degree murder and found both the (F)(2) and (F)(6) aggravating factors. Bearup represented himself at sentencing and presented no mitigating evidence. The jury returned a verdict of death for the murder.

The Arizona Supreme Court affirmed the convictions and sentences on direct appeal. *Bearup*, 221 Ariz. at 166–67, 211 P.3d at 687–88. After unsuccessfully pursuing post-conviction relief ("PCR") in state court, Bearup filed a petition for writ of habeas corpus in this Court on August 25, 2017, and an amended petition on September 18, 2017. (Docs. 34, 39.)

**APPLICABLE LAW**

A petition for habeas corpus may be amended pursuant to the Federal Rules of Civil Procedure. 28 U.S.C. § 2242; *see also* Rule 12, Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (providing that the Federal Rules of Civil Procedure may be applied to habeas petitions to the extent they are not inconsistent with the habeas rules). The Court looks to Rule 15 of the Federal Rules of Civil Procedure to address a motion to amend a pleading

in a habeas corpus action. *See James v. Pliler*, 269 F.3d 1124, 1126 (9th Cir. 2001). Leave to amend shall be freely given "when justice so requires," Fed. R. Civ. P. 15(a), and courts must review motions to amend in light of the strong policy permitting amendment. *Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th Cir. 1986). The factors that may justify denying a motion to amend include undue delay, bad faith or dilatory motive, futility of amendment, undue prejudice to the opposing party, and whether petitioner has previously amended. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).

Leave to amend may be denied based on futility alone. *See Bonin*, 59 F.3d at 845. To assess futility, a court evaluates whether relief may be available on the merits of the proposed claim. *See Caswell v. Calderon*, 363 F.3d 832, 837–39 (9th Cir. 2004) (conducting a two-part futility analysis reviewing both exhaustion of state court remedies and the merits of the proposed claim). If the proposed claims are untimely, unexhausted, or otherwise fail as a matter of law, amendment should be denied as futile. *Id.* Where the legal basis for a cause of action is tenuous, futility supports the refusal to grant leave to amend. *Id.* at 837.

**DISCUSSION**

Respondents argue that "[b]ecause the new claims and arguments are untimely, procedurally defaulted, and/or meritless, it would be futile to allow Bearup to add them to his habeas petition." (Doc. 113 at 1.) For the reasons discussed below, the Court agrees that amendment is futile.[2]

**A. Transcript of the May 4, 2007, kidnapping sentencing hearing**

Bearup seeks to amend three claims and add one new claim based on his discovery that the Arizona Supreme Court did not have the transcript of the May 4, 2007 hearing when it reviewed his death sentence.

---

[2] Respondents also assert that the proposed amendments are not timely under 28 U.S.C. 2244(d)(1)(A) and 28 U.S.C. § 2244(d)(1)(D). Because the Court finds that amendment is futile on the grounds that the amended claims are procedurally defaulted and/or meritless, the Court need not address the question of timeliness.

- 4 -

Bearup represented himself during the penalty phase of sentencing on his murder conviction. He waived the presentation of any mitigating evidence. (RT 2/1/07 at 11.)³ On February 5, 2007, the jury voted to sentence him to death. (RT 2/5/07 at 3.)

With respect to the kidnapping conviction, on April 17, 2007, Bearup filed "Letters of support for mitigation and sentencing hearing," attaching 20 letters written by family and friends. (ROA 410.) Additional letters of support were attached to a probation violation report filed on May 18, 2007. (ROA 419.) On May 4 and 18, 2007, the trial court held a sentencing hearing on the kidnapping conviction, after which the court sentenced Bearup to a term of 12 years' imprisonment. (RT 5/18/07 at 33.)

Three witnesses spoke on Bearup's behalf at the hearing. A friend, Pamela Sweet, stated that Bearup "always had a very kind heart, very honest and open . . . I don't believe he would hurt anybody. . . [H]e's been there for me, emotionally, personally. Even though [sic] the situation where he is right now." (*Id.* at 13.) Cherie Abbey, Bearup's foster mother, stated that, "He is welcome in my home any time . . . and his children need him desperately. They got a mother in their life but they need that role model of a male, and Patrick needs to be there." (*Id.* at 14.)

Ben Butler, a detention officer, also testified for Bearup. He stated that Bearup posed no problems in the jail. (*Id.* at 16.) He was a helpful inmate, and once informed Butler that drugs were being brought into the facility. (*Id.* at 17.) Although Bearup was classified as a member of the Aryan Brotherhood, Butler thought he "didn't fit the bill"; he treated Butler, who is black, courteously. (*Id.* at 18.) Butler "had no reason to believe [Bearup] belonged to that group." (*Id.*)

The transcript from this hearing was apparently filed under an incorrect case number and was not included in the record before the Arizona Supreme Court during Bearup's appeal. (*See* Doc. 88-1, Ex. TTTTTTTT.)

---

³ "RT" refers to the court reporter's transcript. "ROA" refers to the record on appeal from trial and sentencing prepared for Bearup's direct appeal to the Arizona Supreme Court (Case No. CR-07-0048-AP).

- 5 -

The claims Bearup seeks to amend on the basis of this new information are Claim 18, alleging that Bearup's death sentence was unconstitutional because the jury was instructed that it could not consider relevant mitigating evidence; Claim 24, alleging that Bearup's constitutional rights were violated by the Arizona Supreme Court's independent review of his death sentence; and Claim 41, alleging ineffective assistance of appellate counsel. He seeks to add Claim 46, alleging that the missing transcript violated his rights to a direct appeal and to meaningful appellate review.

**Procedural default**

Respondents contend that Claims 18, 24, 41, and proposed Claim 46 are procedurally defaulted and therefore amendment would be futile.

**Claim 18:**

In Claim 18, Bearup alleges that the trial court's jury instruction on sentencing disparity as a mitigating factor violated *Eddings v. Oklahoma*, 455 U.S. 104 (1982), which holds that under the Eighth and Fourteenth Amendments the sentencer in a capital case must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. (Doc. 39 at 272.) In his PCR petition, Bearup alleged that "the trial court's penalty phase instruction on sentence disparity was constitutionally deficient [sic] failing to adequately permit jurors to consider and give effect to this mitigation in violation of the Eighth and Fourteenth Amendments." (Doc. 46-2, Ex. RRRRR at 81.)

Respondents contend that the claim presented in state court differs from Claim 18 and that in his petition for review ("PR"), Bearup failed to state a federal basis for the claim. (Doc. 45 at 153–54.) The Court disagrees. In his PCR petition, Bearup alleged that the jury instruction violated his Eighth and Fourteenth Amendment rights. (Doc. 46-2, Ex. RRRRR at 81.) In support of the claim, he cited *Boyde v. California*, 494 U.S. 370 (1990), and *Penry v. Johnson*, 532 U.S. 782 (2001). (Doc. 46-2, Ex. RRRRR at 83.) He argued that the trial "court's bare bones instruction concerning the disparity of sentences of the co-defendants prevented the consideration of constitutionally relevant evidence." (*Id.*) The PCR court rejected the claim on the merits. (Doc. 46-3, Ex. YYYYYY at 18.)

In his PR, Bearup raised the same claim, alleging violations of the Eighth and Fourteenth Amendments. (Doc. 46-4, Ex. DDDDDDDD at 49.) In his reply to the State's opposition to his PR, Bearup cited *Eddings* in support of his argument that due to the jury instruction, "jurors were not permitted to consider all of the mitigating evidence that was in front of them." (Doc. 46-4, Ex. FFFFFFFF at 32.)

In *Kelly v. Small*, 315 F.3d 1063, 1067 (9th Cir. 2003), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007), the Ninth Circuit held that a petitioner fairly presents his claims when he "explicitly raises the federal claims before a lower court and that court addresses the questions in its decision in a manner sufficient to put a reviewing court on notice of the specific federal claims." Bearup explicitly raised, and the PCR court ruled on, a claim challenging the jury instruction.

The claim raised in state court and Claim 18 do not differ, and Bearup raised the federal basis for the claim in state court. Therefore, Claim 18 is properly exhausted.

**Claim 24:**

On direct appeal, Bearup argued that the Arizona Supreme Court "is required to conduct independent review of aggravators and the propriety of defendant's death sentence." (Doc. 46, Ex. A at 34.) He did not, however, properly exhaust the claim by raising it in a motion for reconsideration to the Arizona Supreme Court.

As Respondents note, Bearup was obligated to give the Arizona state courts at least one "fair opportunity to act" on this claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). Because Claim 24 "alleges error during the Arizona Supreme Court's sentencing review, that review itself did not provide the court notice of, or an opportunity to correct, the alleged error. The proper method to give the Arizona Supreme Court an opportunity to rule on a claim of error arising during an appeal itself is a motion for reconsideration." *Greene v. Schriro*, No. CV03-605–TUC–FRZ, 2006 WL 2821670, at *13 (D. Ariz. Sept. 29, 2006); *see* Ariz. R. Crim. P. 31.20(c) ("A party desiring reconsideration of a decision must file a motion for reconsideration in the appellate court no later than 15 days after entry of the decision."); *Correll v. Stewart*, 137 F.3d 1404, 1418 (9th Cir. 1998) (finding

procedural default of claim based on error of the Arizona Supreme Court where petitioner failed to file motion for reconsideration, which is "an avenue of relief that the Arizona Rules of Criminal Procedure clearly outline"). Therefore, Bearup failed to fairly present Claim 24 to the Arizona Supreme Court. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (holding that a petitioner must present every claim to the state's highest court if there is an available means).

Bearup contends that pursuant to Rules 32.1(e) and (h) of the Arizona Rules of Criminal Procedure he is not precluded from returning to state court to file a second PCR petition to exhaust this claim. (*See* Doc. 117 at 5.) Under Rule 32.1(e), a claim is not precluded where "[n]ewly discovered material facts probably exist and such facts probably would have changed the verdict or sentence." Ariz. R. Crim. P. 32.1(e). Rule 32.1(h) provides an exception to preclusion where "[t]he defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty." Ariz. R. Crim. P. 32.1(h). The newly-discovered evidence Bearup presents does not meet these criteria. As discussed in more detail below, Bearup chose not to present any mitigating evidence at his sentencing on the murder conviction. Evidence from his later sentencing on the kidnapping conviction was therefore irrelevant to the review of his death sentence. Rules 32.1(e) and (h) are not applicable.

Because Bearup has no available state court remedies to exhaust this claim, *see* Ariz. R. Crim. P. 32.2 and 32.4(a), it is technically exhausted but procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 735 n.1 (1991). Bearup does not assert cause and prejudice or a fundamental miscarriage of justice to excuse the default. Claim 24 is procedurally barred and will be dismissed.

**Claim 41:**

In his habeas petition, Bearup alleges that appellate counsel performed ineffectively by failing to raise several meritorious claims. (Doc. 39 at 366.) Specifically,

he alleges that appellate counsel failed to raise claims (A) challenging Bearup's competency and the trial court's failure to hold competency hearings; (B) alleging that at least one biased juror sat on Bearup's jury; (C) challenging the sentencing disparity as violating Bearup's right to an individualized sentence; (D) alleging interference with Bearup's access to counsel; and (E) alleging a number of challenges to Bearup's death sentence and execution. Bearup seeks to amend Claim 41 with the mitigating information from the kidnapping sentencing. (Doc. 101 ta 9.)

Respondents contend that the new claim is defaulted because Bearup did not raise it in state court. (Doc. 113 at 12.) Bearup contends that "[e]ach part of Claim 41 rests on a single premise that the cumulative prejudice of appellate counsel's errors deprived Bearup of fair proceedings." (Doc. 119 at 10.) This argument is unpersuasive.

In the context of ineffective assistance of counsel claims, each unrelated allegation of counsel's ineffectiveness is generally considered a separate claim for purposes of exhaustion. *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (citing *Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005)). Although all ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984), this shared analytical framework does not establish that the claims are related. *See, e.g.*, *Moormann*, 426 F.3d at 1056 (finding petitioner's claim that "counsel was ineffective for failing to investigate and present a viable defense" did not fairly present the more specific claim that counsel was ineffective in "presenting the insanity defense").

Bearup next argues that "postconviction counsel's failure to raise this particular deficiency in appellate counsel's performance should excuse the default." (Doc. 119 at 11.) As Bearup also notes, however, the Supreme Court has held that ineffective assistance of PCR counsel only excuses the default of claims of ineffective assistance of *trial* counsel, not appellate counsel. *Davila v. Davis*, ___U.S. ___, 137 S. Ct. 2058 (2017).

Because the new allegation of ineffective assistance of appellate counsel is defaulted and barred from federal review, amending Claim 41 would be futile.

**Claim 46:**

Proposed Claim 46 alleges, based on the omission of the May 4, 2007 transcript, that Arizona Supreme Court affirmed Bearup's death sentence "on a materially incomplete record." (Doc. 101-2, Ex. H at 1.) Bearup did not raise the claim in state court, and it is subject to the same analysis as Claim 24. Contrary to Bearup's argument, Rules 32.1(e) and (h) do not apply to waive preclusion of the claim. Because Bearup has no available state court remedies to exhaust these claims, *see* Ariz. R. Crim. P. 32.2 and 32.4(a), they are technically exhausted but procedurally defaulted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 735 n.1 (1991). Bearup does not assert cause and prejudice or a fundamental miscarriage of justice to excuse the default. Proposed Claim 46 is therefore defaulted and barred from review.

**<u>Merits</u>**

Respondents contend that amendment is futile with respect to Claims 18, 24, 41, and proposed Claim 46 because the Arizona Supreme Court's review of Bearup's death sentence would not have been affected by the transcript of the later kidnapping sentencing. The Court agrees.

The Arizona Supreme Court "independently review[s] the jury's findings of aggravation and mitigation." *State v. Glassel*, 211 Ariz. 33, 55, 116 P.3d 1193, 1215 (2005); *see State v. Ellison*, 213 Ariz. 116, 141, 140 P.3d 899, 924 (2006) ("This court must independently review the aggravating and mitigating circumstances found during sentencing and the propriety of the death sentence.").

Bearup represented himself at the capital sentencing and waived the presentation of mitigation. (RT 2/1/07 at 11.) The jury therefore made its sentencing decision based on the evidence presented during the guilt phase of trial. In its independent review of Bearup's death sentence, the Arizona Supreme Court considered the same evidence that was before the jury. None of the evidence presented during the subsequent kidnapping sentencing was

before the jury when it sentenced Bearup to death, and the Arizona Supreme Court would not have considered such evidence during its independent review of Bearup's death sentence. Accordingly, even if the May 4, 2007, transcript had been in the record, it would not have affected the court's review of the jury's findings and the propriety of the death sentence.

Bearup contends that the Arizona Supreme Court's independent review of death sentences does in fact encompass evidence that was not before the sentencing jury, including, in his case, the murder sentences of his co-defendants. (Doc. 117 at 7–8.) As the Arizona Supreme Court noted, however, the issue of sentencing disparity was before the jury, with both Nelson and Johnson testifying to the terms of their plea agreements. *Bearup*, 221 Ariz. at 174, 211 P.3d at 695. Therefore, in reviewing the jury's sentencing determination, the court did not, as Bearup suggests, consider evidence beyond that available to the jury. Bearup offers no further support for his argument that the Arizona Supreme Court's review of a death sentence extends to evidence that was not before the sentencer. This is consistent with the court's explanation of its role as "independently *reviewing the jury's findings of aggravation and mitigation.*" *Glassel*, 211 Ariz. at 55, 116 P.3d at 1215 (emphasis added); *see State v. Hill*, 174 Ariz. 313, 326, 848 P.2d 1375, 1388 (1993) ("[W]e review the sentencing hearing and aggravating and mitigating circumstances to ensure that proper procedures were followed and the proper factors determined and weighed.").

In sum, the record on appeal was not, as Bearup contends, "missing documents necessary to adequate review" of his death sentence. (Doc. 101-2 at 53.)

Accordingly, Claim 46 is meritless, as are the proposed amendments to Claims 18, 24, and 41. The legal basis of these claims—that the Arizona Supreme Court's independent review of death sentences includes evidence not in the record at sentencing—is "tenuous." *Caswell*, 363 F.3d at 837.

Claims 24, 41, and proposed Claim 46 are procedurally defaulted and barred from review. Claims 18, 24, 41, and proposed Claim 46 are meritless. Amendment is therefore denied as futile.

**B.     Letters from the prosecutor**

Bearup seeks to add two claims based on the letters he received from the Maricopa County Attorney's Office after filing his habeas petition. (*See* Doc. 101-2 at 60–65.) In the letters, the prosecutor in Bearup's case stated, in response to co-defendant Sean Gaines's attempt to negotiate a plea, that he believed Gaines to be "the ring leader of the group that killed Mark Mathes" and that Gaines was the co-defendant with "the most extensive and violent record." (Doc. 77-1, Ex's 206, 207.) Bearup seeks to amend his petition to add proposed Claim 47, alleging a *Brady* violation, and proposed Claim 48, alleging prosecutorial misconduct.

**Claim 47:**

In proposed Claim 47, Bearup alleges that the prosecutor's failure to disclose the letters violated *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. 101-2 at 60–62.) Respondents contend that amendment is futile because the claim is procedurally defaulted and meritless. They argue that there was no *Brady* violation because the letters were not favorable to Bearup and contained no information that Bearup did not already have. They also contend that there is no reasonable probability that Bearup's convictions or sentences would have been different if he had possessed the letters at trial.

Bearup did not present this claim in state court. Absent the application of one of the exceptions to preclusion, the claim would be found waived and untimely if Bearup were to return to state court. *See* Ariz. R. Crim. P 32.2(a)(3), 32.4(a), 32.2(b); 32.1(d)–(h). As discussed above, under 32.1(e) an exception to preclusion exists where "newly discovered material facts probably exist, and those facts probably would have changed the judgment or sentence."

The prosecutor's letters do not satisfy Rule 32.1(e) because they would not "probably have changed the judgment or sentence." Amendment would also be futile because the claim of a *Brady* violation is meritless.

To establish a *Brady* violation, a defendant must show three elements: that the evidence in question was favorable to him, that the evidence was suppressed by the government, and that the evidence is material. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Respondents contend that there was no *Brady* violation because the letters were not favorable to Bearup, contained no information that Bearup did not already have, and were not material. The Court agrees.

Bearup contends that the prosecutor's statements in the letters that Gaines was the "ring leader" with the most extensive criminal record are favorable to him because they "undermined [the prosecutor's] argument to the jury that Bearup was a leader among the group responsible for Mathes's death." (Doc. 101-2 at 60–61.) As Respondents note, however, the prosecutor did not argue that Bearup was more culpable than Gaines. Instead, he argued that Bearup was more culpable than co-defendant Johnson because Bearup and Gaines were leaders while Johnson was not. (RT 2/1/07 at 21.) Therefore, the information in the letters was not favorable to Bearup.

Nor was the information suppressed. Bearup was aware that the State considered Gaines, along with Bearup, a leader among the co-defendants. In its opposition to Bearup's motion to preclude evidence of his gang affiliation, the State explained that it had disclosed evidence showing that Bearup and his co-defendants were skinheads and white supremacists. (ROA 103 at 2–3.) Johnson, a recent recruit to the group, was being mentored by Gaines, who was a leader in the skinhead movement.

At argument on the motion, the prosecutor asserted that Josh Fiedler, Jessica Nelson's boyfriend, "was the head of this organization." (RT 9/30/05 at 5.) When Fiedler went to prison, he told Nelson that, "if she had problems or issues, that she should contact Gaines." (*Id.*) The parties and the court discussed the hierarchical nature of the group and

the fact that Gaines was positioned just below Fiedler. The prosecutor stated that "Gaines was in charge of the group while Fiedler was in prison." (*Id.* at 17–18.)

At trial, the prosecutor told the jury that Gaines was a leader of the group that murdered Mathes. In his guilt-phase closing arguments, the prosecutor asserted that the evidence showed that Johnson "was a lackey for Gaines. Whatever Gaines told him to do, he was willing to do it." (RT 1/25/07 at 25.) The prosecutor also argued in the penalty phase that "Nelson set this up, Johnson participated substantially. Johnson was 19 at the time. Bearup was 24. Johnson was not the leader. He was a follower. Bearup was a leader. Gaines was a leader." (RT 2/1/07 at 21.) Bearup therefore knew, even without the prosecutor's letters to Gaines's counsel, that the State believed Gaines to be a leader of the group that killed Mathes.

No *Brady* violation occurs "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source because in such cases there is really nothing for the government to disclose." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (internal quotation marks omitted); *see Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) ("[W]here the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense."); *United States v. Bond*, 552 F.3d 1092, 1095–96 (9th Cir. 2009) (internal citations omitted) (if the "defendant has enough information to be able to ascertain the supposed *Brady* material on his own," and "there was no government action to throw the defendant off the path of the alleged *Brady* information," there is no suppression). The State did not suppress evidence that it regarded Gaines as a leader of the group responsible for the murder of Mathes.

Finally, the prosecutor's opinion that Gaines was a leader was not "material." Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been

- 14 -

different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Bearup argues that he was prejudiced because if trial counsel had had access to the letters, they "may have perceived [the prosecutor] to be more open to negotiate an agreed-upon disposition short of trial." (Doc. 101-2, Ex. I, at 62.) However, as just discussed, Bearup's counsel knew that the State regarded Gaines as a leader of the group that killed Mathes and could have sought a plea agreement from the State based on that knowledge. There is no reasonable probability that the letters would have made any difference in counsel's decision whether to seek a plea deal. Nor has Bearup demonstrated that there was a reasonable probability that the State would have offered a plea agreement had counsel sought one or that he would have accepted a plea agreement if one had been offered. The State entered into plea agreements with Johnson and Nelson to secure their testimony against Bearup and Gaines. *See Bearup*, 221 Ariz. at 175, 211 P.3d at 696. It is unlikely that the prosecutor would have offered Bearup himself a plea agreement. In addition, as Respondents note, the fact that Bearup maintained his innocence and presented an alibi defense suggests that he was unlikely to have entered into an agreement that required him to admit his guilt.

Bearup next contends that he was prejudiced in the guilt phase of trial because the letters "supported an argument that Bearup was a follower, rather than a leader, and therefore was less likely to form an intent to harm Mathes before Johnson attacked him." (Doc. 101-2 at 62.) Again, Bearup knew, even without the letters, that the prosecutor considered Gaines to be a leader of the group that killed Mathes. Based on that information, Bearup could have made the argument that he did not intend to harm the victim. That argument, however, would have conflicted with Bearup's alibi defense. Bearup has not established a reasonable probability that the prosecutor's letters would have caused him to change his defense strategy and admit his presence at the murder. Moreover, given the evidence presented at trial, there was not a reasonable probability that the jury would have believed that Bearup did not intend to harm Mathes. Bearup, armed with a knife, arrived at

the house with Gaines and Johnson, who were also armed, to confront the victim. There was no reasonable probability that the jury would have acquitted Bearup if counsel had argued that he did not intend to harm Mathes.

Finally, Bearup asserts that the letters would have "undermined [the State's] sentencing arguments that Bearup was a major participant who deserved death because he was a leader of the group responsible for killing Mathes." (Doc. 101-2 at 62.) Bearup argues that using the letters he "could have effectively challenged the State's case with the prosecutor's own statements." (*Id*.) The Court disagrees. Bearup represented himself at sentencing. He presented no mitigating evidence or argument in support of a life sentence. (*See* RT 2/1/07 at 11.) In his allocution, Bearup continued to assert that he had no involvement in Mark Mathes's death. (*Id*. at 12.) Under these circumstances, there was no reasonable probability that Bearup would have argued for a life sentence if he had possessed the prosecutor's letters.

The prosecutor did not violate *Brady* by failing to disclose the letters he wrote to Gaines's counsel. The letters were not favorable to Bearup and contained no information that Bearup did not already have. There was not a reasonable probability that Bearup's convictions or sentences would have been different if he had had the letters at trial.

Because there was no *Brady* violation, Claim 47 is meritless and amendment would be futile.

**Claim 48:**

In proposed Claim 48, Bearup alleges that the prosecutor committed misconduct by arguing to the jury that the disparity in his sentence compared to Johnson's and Nelson's sentences was explainable, and therefore not mitigating, by the fact that Bearup was a leader in Mathes's murder. (Doc. 101-2 at 64–65.)

Respondents contend that the claim is procedurally defaulted and meritless. In his PCR petition, Bearup presented a claim that the prosecutor committed misconduct by arguing that Bearup was a leader of the group that killed Mathes. (Doc. 46-1, Ex. PPPPP at 82, 84–87.) The PCR court rejected the claim. (Doc. 46-3, Ex. YYYYYY at 18.) In his

petition for review, Bearup listed "Prosecutorial misconduct" in the heading of the claim but offered no supporting arguments and cited no federal constitutional law. (Doc. 46-4, Ex. DDDDDDDD at 49–51.) Respondents contend that Bearup thereby failed to properly exhaust the claim. The Court disagrees. As noted above, a petitioner fairly presents his claims when he "explicitly raises the federal claims before a lower court and that court addresses the questions in its decision in a manner sufficient to put a reviewing court on notice of the specific federal claims." *Kelly*, 315 F.3d at 1067. Bearup explicitly raised, and the PCR court ruled on, a claim of prosecutorial misconduct. Therefore, the claim was fairly presented.

Although it is not procedurally barred, Claim 48 is meritless and therefore amendment is futile.

The appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). Therefore, in order to succeed on this claim, Bearup must prove not only that the prosecutor's remarks were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* In determining if Bearup's due process rights were violated, the Court "must consider the probable effect of the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). In *Darden*, the Court assessed the fairness of the petitioner's trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence, whether the trial court gave a curative instruction, and "the weight of the evidence against [the] petitioner." 477 U.S. at 181–82.

Under this standard, Bearup's due process rights were not violated. The prosecutor's argument that the disparity in sentences was explained by Bearup's role as a leader of the attack on Mathes was not inconsistent with his statements in the letters to Gaines's counsel. Contrary to Bearup's arguments, the prosecutor did not misstate the evidence or make

insinuations he knew to be false. In fact, in his closing argument at the mitigation stage of sentencing, the prosecutor expressly acknowledged that both Gaines and Bearup were leaders. (RT 2/1/07 at 21.)

"Counsel are given latitude in the presentation of their closing arguments, and courts must allow the prosecution to strike hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996) (internal quotation marks omitted). From the evidence presented at trial, there was a fair inference to be drawn that Bearup ranked higher than Johnson, a new recruit, in the group that killed Mathes and was a leader relative to Johnson and Nelson. The prosecutor's letters to Gaines's counsel do not change that fact.

Because there was no prosecutorial misconduct, proposed Claim 48 is meritless and amendment would be futile.

## CONCLUSION

As set forth above, the claims and proposed claims are either procedurally defaulted and barred from federal review or meritless. Therefore, amendment is futile. Accordingly,

**IT IS HEREBY ORDERED denying** Bearup's motion to amend (Doc. 101).

**IT IS FURTHER ORDERED denying** Claim 24 as procedurally defaulted and barred from federal review.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall, pursuant to Fed. R. Civ. P. 25(d), substitute, as a Respondent, David Shinn for Charles L. Ryan as Director of the Arizona Department of Corrections. The Clerk shall update the title of this case to reflect this substitution.

Dated this 23rd day of December, 2019.

Honorable Steven P. Logan
United States District Judge